NOT DESIGNATED FOR PUBLICATION

No. 122,696

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS, ex rel., SECRETARY OF DEPARTMENT
for CHILDREN and FAMILIES; J.F., Minor Child,
By and Through the Mother and Natural Guardian, E.F., and E.F.,
*Appellees*,

v.

M.R.B. JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed October 16, 2020. Reversed and remanded with directions.

*Emily A. Hartz* and *Krystal L. Vokins*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Lawrence, for appellant.

*Jody M. Meyer*, of Lawrence, for appellees.

Before GREEN, P.J., STANDRIDGE, J., and MCANANY, S.J.

PER CURIAM: M.R.B. Jr. (father), a resident of Pennsylvania, moved the trial court to modify residential custody of his biological daughter, J.F. She currently resides with her biological mother, E.F. (mother) in Kansas. The court denied the father's motion. We conclude that the trial court abused its discretion in denying the father's motion to change the residential custody of J.F. Thus, we reverse the decision of the trial court and order that primary residential custody of J.F. be changed to her father, and we remand with

1

directions to the trial court to make all other orders that are not inconsistent with this opinion.

The trial court held a hearing on the motion to modify residential custody of J.F. in April 2019.

The father and mother met in July 2011 when the father was stationed at Fort Campbell, Kentucky. Their relationship lasted six to eight weeks. After their short relationship ended, they lost contact for a while. The mother later contacted the father to tell him that she was pregnant. J.F. was born in 2012.

J.F. never lived with both parents at the same time. For the first five years of her life, her primary caretakers were her maternal grandmother, her mother, and her mother's boyfriend, Joe. The father has never lived in the same state as J.F. The father's service in the military continued until August 2017. Between 2012 and 2017, The father visited J.F. about 10 times, between deployments to Iraq and enrollment in an intensive military training school.

The father testified that he always had difficulty exercising parenting time because of the mother's interference. He testified that his first parenting time was Labor Day 2012, but the mother opposed the visit. He explained that her opposition led to his August 2012 motion for temporary order of parenting time, alongside his voluntary acknowledgement of paternity. After a hearing, the trial court ordered parenting time for the father on Labor Day weekend 2012. After that first parenting time, the mother continued to disagree with the father's exercise of parenting time. These disagreements frequently resulted in a need for intervention from attorneys and the court.

Meanwhile, the mother and J.F. lived with Joe until the mother moved into her own place with J.F. in August 2016. Then, in November 2016, the mother and J.F. moved

in with Nick, the mother's then-boyfriend. In January 2017, the mother had a falling out with Nick. She and J.F. moved out of Nick's home and moved back in with Joe. Shortly after the mother and J.F. left Nick, Nick committed suicide. In total, J.F. moved with her mother into five different residences in two years.

In February 2017, the father moved to modify residential custody, outlining 11 reasons for switching residential custody from the mother to himself. In summary, the father's allegations were that the mother did not provide a stable environment for J.F. due to multiple moves and changing relationships; that J.F. was in the mother's home the day Nick committed suicide; that the mother failed to give the father information regarding her relationships and moves; that J.F. had two crowns and two fillings by the age of four, causing the father's concern about her dental hygiene; that J.F. had head lice; that J.F. reported being spanked by the mother's boyfriend; that the mother brought J.F. into disputes between her parents; and that it would be healthy for J.F. to live with her father and his family in Pennsylvania.

The trial court order the parties to mediate. When mediation was unsuccessful, the court appointed Tracey Mackeprang to prepare a prehearing summary based on a limited home study and custody evaluation. The court then held a trial on the father's motion to modify in November 2017. The court denied the motion, noting that the parties never had a relationship where they could build up some kind of trust with each other and in each other's judgment. The court admonished the parties for "swearing at each other by text." Particularly, the court told the father: "you aren't going to get any cooperation from a mother about seeing your child when you talk that way."

But the court also acknowledged the fears at the heart of communication difficulties, stating, "both of you are afraid of each other is the bottom line." The court acknowledged that the mother's fear was that the father was building a case against her to

3

change custody of J.F. The court understood the father's fear was that the mother would shut him out of J.F.'s life.

In its ruling, the court specified that it was the father's burden to show that there are substantial changes in circumstance that require a change of custody, and he had not met that burden. Specifically, the court did not find neglect, did not find that the mother was encouraging J.F. to lie, and found that J.F. was not present when Nick committed suicide.

In July 2018, the father moved the court for a psychologist's examination of J.F. The father requested the examination because J.F. had told him that she had been spanked by the mother and her boyfriend. Danielle Rowley, a licensed master's level social worker, examined J.F. and then, beginning in September 2018, conducted therapy sessions with J.F. at least once a week. Rowley testified that J.F. is generally "a very expressive child" with "lots of good verbalization methods" and that "you can read her facial emotions very clearly." According to Rowley, J.F. typically "doesn't hide much" and gives honest answers to the best of her ability. To Rowley, J.F.'s discomfort is readily apparent when she does not want to answer a question.

The intake process involved a private session with each parent before J.F. had her first therapy session with Rowley. During the mother's intake session, the mother told Rowley that J.F. has had an eventful life. The mother said that J.F. had been through a lot of different changes because of the mother's romantic relationships. In describing these moves to Rowley, the mother said she was hopeful that therapy would be beneficial for J.F.

At Rowley's first session with J.F., the mother dropped off J.F. and asked if it would be fine to leave J.F. with Rowley so the mother could run a few errands downtown. Rowley said that was fine, and the mother left. During the session, J.F. asked

4

Rowley, "Did my mom leave?" J.F. then said, "I'm fine I just wanted to know so I could tell you something." At the time, the mother and J.F. were living with Joe. J.F. told Rowley about a time when she was in the shower and was being "bad" and she was "hit across the face by Joe because I am bad and then I didn't stop crying so he said he was going to throw all my stuffies away." Rowley asked J.F. if her dad in Pennsylvania had ever did things similar to what Joe did. J.F. replied, "No Silly, I just go to time out on the steps there." After J.F. provided additional information about the incident, she quickly added, "I just wanted to tell you that before my mom gets back because she told me on the way here that I can't tell you those things and that your job is to make me go live with my dad in Pennsylvania."

In October 2018, the mother and Rowley spoke alone after J.F.'s therapy session. The mother said that she wanted to move herself and J.F. out of Joe's home but had not told J.F. yet. The mother asked Rowley for a therapist's opinion on how she could tell J.F. in such way to have the least amount of negative impact on J.F., especially in light of the previous upheavals in J.F.'s life. But during session earlier that day, J.F. had already told Rowley that she knew about the move and that she needed to keep it a secret from Joe.

In that October 2018 conversation, Rowley also told the mother that J.F. disclosed fears about interactions between the mother and Joe. J.F. used phrases such as "scary voices," "loud voices," or "mean voices" to describe the interactions. The mother confirmed that there had been issues going on in the home "regarding yelling and probably not appropriate interactions" which J.F. witnessed. The mother assured Rowley that Joe would not be left alone with J.F. moving forward. Rowley testified to how that conversation ended, stating the following: "I don't remember exactly how [the mother] worded it, but essentially she said, if I wasn't confident in my decision to leave before, I am now."

5

J.F. expressed sadness because she was not allowed to tell Joe, or his son, Evan, about moving out. Joe had been in J.F.'s life since she was an infant, and she referred to him as dad and called Evan her brother. Rowley asked the mother why the move had to be kept a secret. The mother explained that she was fearful of Joe's reaction if he knew she was going to be moving. On the day of the move, the mother started moving out in the middle of the day while Joe was at work. Joe learned about the move when he came home and saw that the mother and J.F. were in the middle of moving. Shortly afterward, Joe sent a text to the father's wife, Donna, which said, "You should have [J.F.]."

Rowley explained that for J.F., moving away from Joe was a loss. As with Nick, moving away impacted J.F. because Nick, Nick's child, Joe, and Joe's son, Evan, were important parts of J.F.'s life. Rowley described those losses as an "unstable relationship pattern." She then outlined the effects, pointing out the following:

> "so when you are looking at the emotional well-being of a child and how they form their basis for what relationships should look like in the future and what they are looking for as they grow, as a therapist, it concerns you as to what foundation is laying for what [J.F.] will later search for in life for relationships as well."

J.F. was also likely to struggle with closure, in Rowley's view. She explained the following:

> "The moves that I am aware of were both reported to me that they were moves that [J.F.} was not aware were going to occur until they were occurring; and then with the most recent move, as I have discussed in detail, she had to keep it a secret or fib or whatever we are going to call it about it, so I don't know if—we do not talk about Nick. With [Joe], he is back in her life now, so I think it just creates another issue of, 'Why did he go' and 'Why is he back' and 'What happened,' because we certainly never process that. We have tried to and it creates feelings of—she doesn't want to talk about those things. She shuts down."

6

In Rowley's written report, she also discussed how J.F. returned to placing Joe in a "father" role and referring to Evan as her "brother." But during the intervening months when J.F. had no contact with Joe, J.F. said that she could no longer refer to him as "Dad" or to Evan as her "brother." Rowley brought up the issue with the mother when the mother brought J.F. to therapy sessions. Rowley tried to address Joe's contact with J.F., but what J.F. disclosed and what the mother was open to disclosing did not always align. J.F. would become "emotional" in Rowley's office because she felt her mother was being dishonest and the mother felt J.F. was being dishonest.

The exit and reentry of Joe in J.F.'s life concerned Rowley, which she expressed to the mother. The concern was that the reasons for J.F.'s contact with Joe being disrupted had never been addressed in therapy. A further concern was the change of story related to Joe hitting J.F. in the shower. In early therapy sessions, J.F. described the incident unprompted multiple times. As J.F. related the incident, water or soap got into J.F.'s eyes in the shower and she cried. Joe was upset that she continued crying, and he hit her across the face and threatened to throw all her stuffies away. Rowley reported, "of concern is that [J.F.] now believes the incident . . . 'was a dream.' . . . She never at any time indicated it was a dream until Joe was noted to be back in her life most recently." In session, J.F. told Rowley, "Yeah, my mom told me it was a dream, but I have had other dreams like that before."

Rowley described a session just before J.F. went to the airport to fly to Pennsylvania. Rowley said, "So during the appointment, she was very excited in my office. I want to clarify. So once the door was shut, she was very excited." Rowley described how J.F. was excitedly showing her pictures of her times in Pennsylvania and saying she was looking forward to going back for spring break. Rowley continued, saying the following: "And she was excited to see her siblings there. She was very happy and very encouraging—I was very encouraging to that. And then when it was time to go, she didn't want me to open the door."

7

Rowley told J.F. that J.F. had a plane to catch and convinced her to leave the privacy of the office. "And then once I got her out into the waiting room, her behavior kind of crumbled. And it was two different kids." Rowley described the contrast in behavior, saying, "She didn't want to go, she didn't want to get on the plane, she didn't want to go to grandma's, she didn't want to go to lunch, she didn't want to go to the airport. It was completely opposite of what was just happening minutes before in the office." Rowley's explanation for J.F.'s behavior, explaining, "I believe that she is just— she is a child that is torn in two different directions. And I think she is scared to show how she feels for some reason about her desire to want to be with dad and spend time with him, or to seem excited, is my opinion." In fact, Rowley testified that in their early sessions, J.F. explicitly said that she wasn't supposed to talk about dad in Pennsylvania.

Rowley summarizes this behavior, stating, "[J.F.] has historically been resistant to discussing things in therapy if she feels that whoever brought her is close enough to hear." One session, J.F. told Rowley that her mother and Joe were fighting again, but refused to elaborate, saying, "they will hear and then I will be in trouble for talking about their business with you." Rowley testified that she is concerned about a theme of dishonesty or keeping secrets.

Rowley gave a further example to illustrate this theme. Rowley realized that J.F. was around Joe again, based on her following interaction with J.F.: "[J.F.] started talking about how she wasn't supposed to tell me [Rowley] that they went over there and things like—she started to disclose those things in therapy." Later, Joe brought J.F. to a few therapy appointments.

Although they had moved out, J.F. told Rowley that she and her mother stayed with Joe periodically. When they were not at Joe's, J.F. and her mother stayed at her mother's apartment in Perry. But there was only one bed, which J.F. usually shared with

8

her mother. Thus, when her mother offered an adult male friend named Spencer a place to sleep for the night, he slept in the same bed with J.F. and her mother.

J.F. told Rowley that she wished she had her own bed at Joe's because she has a bed at her Meemaw's (maternal grandmother) and a bed at her dad's house in Pennsylvania. Initially, J.F. said that she slept on the couch at Joe's. But in later sessions, J.F. told Rowley that she slept in Evan's bed because he wasn't there. But J.F. hoped that they would have her bed back soon because she missed her bed there. Other than discussing her bed, J.F. was reluctant to share details about living with Joe, for example, how she gets home from school.

Rowley testified to the impact of an adult asking a child to keep secrets. Rowley said, "it reinforces that lying is ok." Rowley referenced information in scientific literature about the critical needs of children, explaining: "it invalidates their need to feel important, because they are being reinforced to be—taught to lie and it influences their emotional well-being overall."

Nevertheless, J.F. was not secretive on other topics and opened up to Rowley and other adults in her life. J.F. was open about spankings she received when staying with her mother. First, when her mother and J.F. were living with Nick, J.F. told her father that Nick had spanked her. Later, J.F. told Rowley that when she "was being bad" her mother spanked her, including once with a belt. Later, J.F. repeated the story to her stepmother, Donna, her father's wife. J.F. affirmed that the story was true: that her mother did hit her with a belt and that J.F. had already told her father about it.

As told by J.F. to her father and Donna, the incident happened in Joe's house, before her mother and J.F. moved out. According to J.F., her mother said that if she didn't finish her dinner, then her mother would hit her with a belt. J.F. described how her mother took her into the bedroom, "laid her down on mom's side of the bed," and hit her

9

with the belt. J.F. said that it really hurt and she cried in a blanket. Donna asked J.F. what happened that she ended up getting hit with a belt. Donna testified:  "And she just said, 'I was really, really bad.' And she was very dramatic about it, 'like really, really, really bad, and I just wouldn't stop being bad.' So mom hit me with a belt." The mother testified that the belt incident never happened.

When J.F. discussed spanking with Rowley, J.F. often explained that she is spanked "because I am being bad." Rowley worked with J.F. on this self-perception. Rowley testified, "because she had this overall—she had this opinion of herself that she was bad. And so we have worked to kind of overcome that and that she's not bad, that maybe some choices she makes aren't appropriate, but you can make great ones, too." The father testified that he saw the same self-perception in J.F. when she described her behavior, or perceived behavior. The father described a time he gave J.F. instructions, following up with saying, "You are being a really good listener." According to the father, J.F. replied, "I am a really good listener in Pennsylvania, but I'm not very good in Kansas."

Rowley's testimony showed that the two homes also differ in how J.F.'s phone calls are handled. J.F. told Rowley about hand signals that her mother uses when J.F. is on the phone with her father. Rowley stated:  "And she has talked about how her mom has hand signals and she demonstrated them to me." Rowley testified that J.F. showed her a hand signal which means "don't talk about it," as well as signals for yes and no.

When counsel asked Rowley if the mother had any methods to encourage J.F. to talk on the phone to her dad, Rowley replied, "I can't think of anything." When asked whether the mother discouraged the phone calls, Rowley described the timing of events and their effect on J.F.'s attitude. Rowley stated the following:

10

"I think that sometimes, phone calls for [J.F.] are just tough because they are happening—like there's—you have to have a phone call before—this is per [J.F.]. You have to have a phone call before dinner, before I can go to dinner. You have to have the phone call . . . [s]o you can't go to [kids club]. . . . So I think just there is always something more desirable on the other side of the phone call. So maybe it makes it more difficult for [J.F.] to feel like she can be open. I think there is always—[J.F.] talks about how a lot of the times, the phone calls are when she wants to be doing other things, like because she is playing with a friend and she gets called in. And so she has to stop what she is doing to make the phone call. So she is having fun and then time out and then has to reengage."

J.F. has told Rowley that she sees the phone calls with her father as an obligation because she has to talk to her father before a more desirable event. Combining the timing of the calls with the "hand signs" that J.F. demonstrated, Rowley said, "This is also concerning as it seems this does not promote the positive side that phone calls have on the child," if J.F.'s descriptions are true and accurate.

Rowley testified that J.F. has a different experience when in Pennsylvania, calling her mother. The father and his wife have told Rowley that they give J.F. her space when she is there for phone calls. Rowley added, "I have never heard anything different from [J.F.] that there is any issue with phone calls." J.F. told Rowley that there are no hand signals when she is with her dad and calls her mom.

Overall, Rowley's assessment of J.F. throughout their counseling sessions was that her emotional state cycled as with any child, but her openness in therapy definitely declined. In Rowley's written report, she noted the following: "a decline in J.F.'s desire to share feelings and work through areas of discomfort in therapy, when in the past she was historically very open." Rowley also wrote, "[J.F.] has had increased trouble at school through both self and parental (both parents) reports."

In Rowley's opinion, J.F.'s life in Kansas is very unstructured, not providing the stability and routine that J.F. seems to want. One thing that J.F. was consistently open with Rowley about was that J.F. oftentimes did not know if she would be sleeping in Perry, or in Oskaloosa, or going to Meemaw's, or going with Aunt Evie. Rowley said, "And so she just really wants to know what's happening and just kind of what is her home base."

J.F. expressed a desire to be in one house. But, Rowley's report says, "she sometimes doesn't know where she is 'sleeping' during the week or on weekends." Rowley noted that her therapy office has become a point of stability in J.F.'s life. During transitions in her life, J.F. often does not want to leave Rowley's office, or she wants to make sure she can take something of Rowley's so she can bring it back.

In summarizing the changes that have happened in J.F.'s life, Rowley stated the following:

> "Since I have worked with [J.F.], she has moved, she has changed schools, she has been unable to say goodbye to someone she viewed as a father [Joe], she has been unable to say goodbye to someone she viewed as a brother [Evan]. [J.F.] has expressed to me—there was an incident around Thanksgiving where I believe she was supposed to go to Pennsylvania, but she was very upset about going to Pennsylvania because she said that they were supposed to have Thanksgiving here at her grandma's and that was the only time she was going to be able to see Aunt [Evie] and her other family. So she was feeling very torn. So we just have this kind of significant level of pressure on a now seven-year-old child."

Rowley stated that J.F. needed structure for her emotional stability. Elaborating on J.F.'s needs, Rowley explained the following:

12

"Specifically, I think [J.F.] needs to feel secure. She needs to know her routine, she needs to know where she is going to be every night, where she is going to attend school, what activities she is going to be in. I think that in order to feel respected, she needs to not be encouraged that lying is okay. She needs to be validated in her feelings. So if she reports that something happened, we need to continue to explore that and hear her out and talk with her. I think overall, just creating kind of a positive environment where we see that people care for one another and we work through our issues and just creating a strong foundation for her to grow from."

Rowley described J.F.'s time in Pennsylvania with the father differently. Rowley said, "[J.F.] is able to articulate to me what her bedtime is in Pennsylvania, what her room looks like, who reads her bedtime stories every night, that she—what activities she is going to participate in, whom she will play with. So she seems to feel like it's a very structured, predictable, consistent environment." Rowley further testified about J.F.'s life with her father and Donna, stating the following: "She understands their home, the rules. She expresses that she feels the love and she has given me examples, and she expresses ways in which those critical needs are being met when she is there for those periods of time, and I believe she does feel secure." Often when J.F. returns from a visit to her father in Pennsylvania, "She is happy and she is excited, she wants to tell me all about what she has done and often brings me lots of pictures or things to show me."

After months of counseling, Rowley gave J.F. a primary diagnosis of Parent-Child Relational Problem and a secondary diagnosis of Child Affected by Parental Relationship Distress. Rowley also pointed to recent symptoms consistent with Adjustment Disorder with disturbance of emotions and conduct. Explaining her primary diagnosis to the court, Rowley testified that Parent-Child Relational Problem "is when children are experiencing difficulty with appropriate discipline or structure methods with one parent or another." Rowley also said that alternative criteria which could result in the same diagnosis would be unresolved parental conflict that is negatively impacting the child in some way. In

13

Rowley's opinion, J.F.'s day-to-day environment was the primary factor in her diagnosis, not conflict between the parents.

J.F.'s attitude toward living with her father evolved over her sessions with Rowley. At the first session, J.F. was scared until Rowley clarified that it was not her job to dictate where J.F. would live. Rowley explained J.F.'s change in attitude, saying, "she, at one time, brought up how she wished her parents could just be neighbors so that she could run down the street like she does with her friends and spend the night at her dad's house." J.F. told Rowley that she was afraid of moving to Pennsylvania because her mom would be very sad without her in Kansas, and she didn't want her mom to be sad. But J.F. eventually said, "it would be okay if I saw my dad like I saw my mom and I saw my mom like I saw my dad."

Julia Butler, J.F.'s guardian ad litem (GAL), read Rowley's reports, Mackeprang's home study and custody evaluation, the pleadings in the case, and the GAL questionnaire forms completed by the father and the mother. Butler also spoke with J.F., Rowley, one of J.F.'s teachers, the mother, the mother's mother, Joe, the father, and counsel for the father and the mother. Throughout, Butler e-mailed the father, the mother, and Rowley. Butler reviewed J.F.'s school attendance records and met with J.F. again. Using the information gathered, Butler made a recommendation "[b]ased upon review of the non-exclusive factors in K.S.A. 23-3203 that the Court should consider in determining child custody, residency, and parenting time."

Butler recommended that the father have primary residential placement of J.F., after J.F. finished the current school year in her Kansas elementary school. To the court, Butler explained the following:

"I don't take the recommendation I made in this case lightly of changing the residences of [J.F.]. . . . The conflict between the parents is not the issue with [J.F.]. The issue with

14

[J.F.] is the instability, the constant worries about where she is going to . . . spend the night, where she has a bed, the constant back and forth, . . . because I think we need to focus on [J.F.'s] emotional health, and I think both reports from Ms. Rowley detail specific incidents and specific statements made by [J.F.] and by [Mother] regarding their situation, their sudden move from Oskaloosa to Perry and their going back to Perry after the court said no overnight guests in the home. I don't believe that, for one second, that the opinions expressed by Ms. Rowley are not neutral or that she is biased in some way against either parent. The issues that Ms. Rowley has concerns about is the continued emotional health of [J.F.] due to continued changes in her regular schedule."

Butler concluded, stating: "I do think that this child deserves the ability to know where she is going to sleep every night, where she has a night routine. I think that is very important and I think that [J.F.] would be served by adopting the Guardian Ad Litem recommendations."

At the end of the April 2019 trial, the court made its findings from the bench. The court first complimented both the mother and the father on the "amazing child" who "is that way because of both of you." Then, the court addressed each parent's perspective, saying the following:

"What I do care about is [I] don't think either one of you respects the other's relationship with this child. You know, I have a hundred percent sympathy for you, {Mother}, that you felt like you had this child all by yourself and were the sole parent for a number of years and why is this man bothering me. I did just fine without him.

"And [Father] I understand your position perfectly. You stepped forward way before many a dad would step forward to establish a relationship with this child. You are the one who actually filed the action to have that determination made. You have shown from the very beginning that your concern is for this child, and that your circumstances at the time were that you were in the military and you did the best you could to maintain a relationship, but your job and position limited that. And then when that military service ended and you had more time and more normal people hours, I guess is the best way to

15

put it, you stepped forward and said, 'Now it's time for me to really have a relationship with this child.'"

Continuing this approach of balancing the actions of each parent, the trial court addressed specific issues with each parent's behavior. The court said, "So mom, this is what concerns me:  I do think that your living situation has been unstable, . . . " The court said a child should not have that kind of instability because it creates a feeling of not really being sure what is happening today or tomorrow. The court also reminded the mother that the parenting plan did not allow physical punishment. And the court told the mother that it "didn't like" her inability to cooperate with the father when he comes to Kansas, stating:  "He has come all the way from Pennsylvania, and he should be able to see the child." Finally, the court was "not happy" that the mother had not followed a court order, stating:  "I said no overnights . . . I meant no overnights, just you and [J.F.]. You can see who you want during the day, but no overnights."

Turning to the father, the court referenced testimony from the mother that police conducted a welfare check at her home. The mother testified that the father called the sheriff because the father thought that J.F. was home alone while the mother was out. The court referenced this incident, saying the following:

> "And the other thing I want dad to—that welfare check just drives me crazy that you would send the police to that house. If [J.F.] would have been there, that would have scared her to death to have the police pounding on the door demanding to know where she was. There had to have been a better way to check out whatever information you were getting, such as calling or texting mom.
> "I just feel like you can't leave her alone. You just nitpick everything she does."

The court began its assessment of residential custody by addressing the father, stating the following:  "I don't really trust you to support mom's relationship with [J.F.], and I look at the ability of mom to long distance—to do a long distance parenting of

16

[J.F.] is nearly impossible, where it is possible for you." The court later explained further, stating the following about the mother: "She doesn't have the finances or the financial stability even with a better job to take weekends or long weekends and fly to Pennsylvania in order to see [J.F.], and dad can do that."

The court acknowledged that J.F. had bonded with, not only each parent, but the families around each parent. The court recalled testimony that J.F. wished her parents lived close together so that she could stay with each one in turn. The court addressed the issue of stability, stating the following: "I do have a concern as far as—just like Ms. Rowley does and just like Ms. Butler does concerning some angst is the best way I can describe it as a lay person that [J.F.] is feeling." The court concluded its analysis by stating the following: "[T]he bottom line is she needs a relationship with both of you and she needs to be able to spend the most time possible with both of you, and the best way to do that is to keep her here in Kansas." The court denied the father's motion to change residential custody but adopted all other recommendations of the GAL.

The father filed an Objection and Request for Findings of Fact and Conclusions of Law in April 2019, alleging that the evidence did not support the court's ruling. In January 2020, the trial court filed written Findings of Fact and Conclusions of Law.

The father timely appeals.

*Did the Trial Court Abuse its Discretion By Awarding Custody to the Mother Based on an Error of Fact?*

We come now to the critical issue of whether the trial court correctly determined that the residential custody of J.F. should remain with the mother. As the father points out in his brief, the trial court reduced the residential custody issue of J.F. to two options: "(1) order residential custody of J.F. remain with [her mother] so that both parents can

17

exercise their parenting time; or (2) order residential custody of J.F. change to [her father] and [her mother] will be unable to exercise her parenting time with J.F." because of her mother's lack of financial resources. We agree with the father that when the trial court ruled in this way, it created a false dilemma.

A false dilemma is a situation in which we are confronted with choosing between two alternatives or options:  often describing one option in the terms of its acceptability while describing the other option as plainly unacceptable and much worse than the other option. We note under the trial court's two options, there is no doubt that few people would disagree with the court's first option. But is there any reason to think that denying the father residential custody of J.F. is the only way both parents can exercise their parenting time with J.F.? More to the point, is there any reason to think that the father could be awarded the residential custody of J.F. and that a process could not be worked out where the mother's lack of financial resources, if any, could be alleviated so she could exercise her parenting time with J.F.?

For example, as the father points out in his brief, the trial court has the authority to make the father responsible for J.F.'s traveling expenses when she is exercising her parenting time with her mother. Thus, the two options which we are left with are neither exclusive nor exhaustive. So we have no reason to believe the trial court's claim—either residential custody of J.F. remain with her mother or her mother will be unable to exercise her parenting time—is true.

*Standard of Review*

Various provisions of K.S.A. 2018 Supp. 23-3201 et seq. guide a trial court's discretionary determination of a child's custody, residency, visitation, or parenting time. The paramount consideration in making these decisions is the child's welfare and best interests. In light of the trial court's unique vantage point of what is often an emotionally

18

charged situation, an appellate court generally will not overturn these decisions unless the court abused its discretion. See *Cheney v. Poore*, 301 Kan. 120, 128, 339 P.3d 1220 (2014). Challenges to specific factual findings in support of these determinations are reviewed to assure that they are supported by substantial competent evidence and that they support the court's legal conclusions. See *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 704, 229 P.3d 1187 (2010). Determination of a correct legal standard raises a question of law subject to de novo appellate review. *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011).

A trial court's modification of an order of custody, residency, visitation, or parenting time is governed by K.S.A. 2018 Supp. 23-3218 et seq. An appellate court generally reviews a trial court's order granting or denying such modification for an abuse of discretion. See *In re Marriage of Grippin*, 39 Kan. App. 2d 1029, 1031, 186 P.3d 852 (2008). Judicial action constitutes an abuse of discretion if it (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *Frazier v. Goudschaal*, 296 Kan. 730, 755, 295 P.3d 542 (2013). A court commits an error of fact if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). With these standards firmly in mind, we turn now to the merits of this appeal.

We now consider the trial court's finding of facts. Four of the trial court's findings of fact are contested in this case.

1.      *The court found that the mother does not have the financial resources to exercise extensive long-distance parenting time.*

The father argues that the trial court erred in finding the mother's net monthly income was $1,800. He notes that no evidence was presented regarding the mother's net monthly income. The mother concedes that she presented no testimony about whether she could afford to make trips to Pennsylvania. Nevertheless, the mother argues that the trial court found that her net monthly income was "approximately" $1,800 and the evidence of the mother's hourly wage and hours worked supported this estimate.

The evidence showed that the mother made $14 per hour at an accounting firm. But the record is not clear on how many hours the mother works. The mother testified that, in general, she worked "8:00 to 5:00 Monday through Friday." But during tax season, her hours are expanded, and the accounting firm is also open from 8:00 to noon on Saturdays with employees sometimes staying past noon. Also, the mother testified that she did not pay rent while living with Joe, but she did help with unspecified bills. The mother cites no other evidence in the record to establish income, deductions, or withholdings. In short, the record does not allow for more than a guess at the mother's true income and expenses. Given the evidence in the record, the trial court's statement that the mother's net monthly income is approximately $1,800 is unsupported.

But the finding of fact contested here was not simply the mother's net monthly income. The trial court stated the following:  "Mother simply does not have the financial resources to exercise such extensive long-distance parenting time. The child should not be deprived of a meaningful relationship with her mother due solely to Mother's financial constraints." To support this finding, the court would need substantial competent evidence of the travel costs as well as the mother's net monthly income. The record shows that the father's annual travel costs amounted to $5,320 or more. The mother cites

20

this amount, as it was previously determined at a July 2018 hearing on child support. The father does not dispute this amount.

Turning to the evidence of the mother's financial inability to travel to and from Pennsylvania to exercise parenting time with J.F., we note no testimony or other evidence was admitted into the record regarding her ability or inability to exercise parenting time with J.F. if J.F.'s residency was changed to her father. On the other hand, the father points out in his brief that the trial court had the authority to change its child support order in this case to reflect compensation for out-of-pocket travel expenses. Indeed, a trial court has the authority under the Kansas Child Support Guidelines to "modify child support orders to advance the welfare of the child when there is a material change of circumstances." Kansas Child Support Guidelines § V.A. (2019 Kan. S. Ct. R. 106).

Also, a trial court has the authority to adjust the child support obligation to assist a parent financially when exercising parenting time. For example, the Guidelines state: "Any substantial and reasonable long-distance transportation or communications cost directly associated with parenting time *shall be considered by* the court. The amount allowed, if any, should be entered on Line E.1." (Emphasis added.) Kansas Child Support Guidelines § IV.E.1 (2019 Kan. S. Ct. R. 100).

Alternatively, the father contends that the court could require him to transport J.F. to Kansas for the mother's parenting time. The father's suggestions point to a relevant fact: No evidence existed in the record showing the mother's ability or inability to pay traveling expenses to exercise her parenting time with J.F. As a result, no evidence supports the trial court's finding that the mother's financial constraints would limit her ability to exercise parenting time with J.F. So the trial court's finding is not supported by substantial competent evidence.

21

2.      *The court found that J.F. does well in the mother's home, has the needs of a typical child, and has adjusted to her home, school, and community.*

The father argues that the reports and testimony of child welfare experts show that J.F. does not do well in the mother's home. He asserts that the testimony and reports of J.F.'s therapist Rowley and GAL Butler show the instability and insecurity of J.F.'s life with her mother, especially their frequent moves and J.F.'s school changes. The father points to the primary diagnosis of Parent-Child Relational Problem and secondary diagnosis of Child Affected by Parental Relationship Distress to show the effect of instability on J.F. The father contends that the trial court abused its discretion based on errors of fact.

The mother responds that the father's argument does not show how the court erred in fact. Instead, the mother contends that the father's argument is simply that the court misapplied, failed to consider, or improperly weighed evidence. Thus, the mother contends that the court did not ignore evidence but weighed the evidence appropriately.

The father's primary assertion on appeal is that J.F. does not do well in the mother's home. The mother responds by pointing to testimony that J.F. was doing well in school. The mother notes that the trial court admitted J.F.'s report cards and a letter from J.F.'s principal into evidence. Those documents are not in the record on appeal. The mother's argument misses the mark because the father does not contend on appeal that J.F. performs poorly at school. Thus, substantial competent evidence supports the finding that J.F. has adjusted to her school, but the father does not argue that the court erred on this part of its finding.

Nevertheless, the mother goes on to address the father's central contention that she does not provide a stable home life for J.F. The mother testified that while the therapist

22

had mentioned that the mother told her that J.F. had an "eventful" life, the mother meant that J.F. had a healthy life, full, and not boring. The mother further testified that she believed J.F. to be emotionally stable, with no behavior problem concerning her mental stability except when she returned from visiting her father. Thus, the mother points to her own testimony as the evidence supporting the finding that J.F. has adjusted to her home.

But in making its finding, the trial court ignored Rowley's testimony and Butler's recommendation. The court's written findings of fact and conclusions of law did not acknowledge Butler's recommendation for residency placement and did not acknowledge Butler's role as GAL. Rowley merits a mention in the trial court's written findings only once: The trial court wrote:

> "Danielle Rowley reported [J.F.] is concerned that Mother and Joe argue in a loud and scary way. Mother denies she and Joe yell or scream at each other. She admits they have argued, as typical couples will. She does not believe it is concerning, but understands it might concern a child to hear arguing."

Also, the court did not acknowledge Rowley's description of J.F.'s relationship with Joe. The mother argues that she presented sufficient evidence for the court to find that J.F. had a warm relationship with Joe. Indeed, the court in fact found that they were close, and Joe had been a father figure for J.F.'s entire life. But the court ignored Rowley's testimony that this closeness was precisely the problem. Rowley agreed that Joe was a father figure, testifying that J.F. was upset and sad that she had to move away from Joe in secret. Rowley testified that J.F. struggled to process why Joe was not in her life and, later, why he was back in her life. Given this context, the mother's and Joe's testimony about J.F.'s attachment supports a finding that J.F.'s home life was unstable in a way which was disruptive for J.F. The court arrived at the opposite conclusion by disregarding Rowley's testimony.

23

Further, from the bench, the court seemingly failed to acknowledge Butler's recommendation that the father have primary residential placement of J.F., stating the following:

> "Anyway, [J.F.] has bonded with the Pennsylvania family, [J.F.] has many bonds here in Kansas, and one of the things that I was listening to Ms. Rowley talk about is, as far as what is stability, and it doesn't just have to do with the house you are in or the school you go to. It really does have to do with the people in your life. And what kind of disruption by my order are we going to have in disrupting her life.
> "I do have a concern as far as—just like Ms. Rowley does and just like Ms. Butler does concerning some angst is the best way I can describe it as a lay person that [J.F.] is feeling, but the bottom line is she needs a relationship with both of you and she needs to be able to spend the most time possible with both of you, and the best way to do that is to keep her here in Kansas."

The court here ignores the recommendation of Butler and the bulk of Rowley's testimony: that J.F. has had significant instability and that she has felt more than angst at times. From the bench, the court acknowledged that J.F.'s living situation with the mother was unstable. But the court's written findings of fact ignored that instability and its effects.

Nevertheless, the mother argues on appeal that the trial court did not ignore the GAL, but simply disagreed with her recommendations. The mother attempts to draw a parallel to *In the Matter of the Marriage of Ray*, No. 121,011, 2020 WL 2502234 (Kan. App. 2020) (unpublished opinion). In *Ray*, the mother contended that the trial court disregarded the testimony of Dan Byarlay and Angela Koerperich, who provided counseling for the family. But the facts of *Ray* differ from the facts here. In *Ray*, the mother's assertion simply misstated what the counselors said in their testimony. The mother contended that Byarlay provided credible testimony of the father's emotional abuse, but the record did not support her claim. The mother also asserted that the father

24

kicked the minor child, an incident that the mother reported to the child's teachers. But the child's therapist was unaware of the incident and could not testify about it. Simply put, the trial court in *Ray* did not ignore relevant testimony because there was no testimony to ignore on those points.

Here, Rowley testified at length at the hearing, after submitting two written reports. Rowley presented evidence that J.F.'s life with the mother was sufficiently unstable and that it negatively affected her emotional well-being. The trial court did not mention any of this evidence in its written findings of fact: "[A] factfinder cannot disregard undisputed evidence that is not improbable, unreasonable, or untrustworthy. Such evidence must be regarded as conclusive." *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 515, 154 P.3d 494 (2007). The mother offered no expert testimony or other qualified evidence to dispute Rowley's diagnoses. The mother also did not dispute the instability of J.F. changing homes and changing schools. In sum, the court's finding that J.F. is well adjusted to her home with the mother is not supported by substantial competent evidence. The trial court's error here was its unwillingness to acknowledge the unchallenged testimony and reports of Rowley, J.F.'s therapist, and the recommendation of Butler, J.F.'s GAL.

*3.     The court was silent on evidence of abuse.*

On appeal, the mother and the father both assert that the court found that there was no evidence of domestic abuse in the mother's home. They are both mistaken about the trial court's findings of fact on the issue of domestic abuse. More precisely, the court declined to adopt a particular finding of fact on domestic abuse.

After the hearing, the father submitted proposed findings of fact and conclusions of law.  On appeal, the father contends that the trial court erred when it did not adopt fact number 29 from his proposed findings of fact. Fact 29 reads as follows:  "Petitioner

25

confirmed allegations that Joe . . . was abusive toward [J.F.] with Ms. Rowley." Thus, the disputed fact was not whether domestic abuse occurred. The disputed fact was about what the mother disclosed to J.F.'s therapist. The mother's testimony does not reflect she told Rowley that Joe was abusive. The father makes an inference when he points to the mother's testimony that she moved because of "deteriorating" circumstances in the home. But this statement is ambiguous and does not support the assertion that the mother confirmed to Rowley that Joe was abusive. The father also claims that the mother "admitted that what [J.F.] had described as verbal abuse was occurring." But the mother's actual testimony was simply that there was yelling. The mother testified that she never identified verbal abuse to Rowley.

In its ruling, the trial court addressed corporal punishment rather than abuse. The court noted, "Mother admits to 'swatting' [J.F.] with her hand." Also, the court stated: "[J.F.] has denied to her Mother she was slapped by [Joe]." Finally, the court wrote: "Grandmother admits she would swat [J.F.] as discipline, but she now uses time outs and talking."

Thus, contrary to the phrasing used by both parties on appeal, the court did not affirmatively state that there was no evidence of domestic abuse. But the court also did not find that there was enough evidence to establish domestic abuse. The court acknowledged only that the mother and her family used corporal punishment until the court's October 2018 journal entry ordered no physical punishment, such as spanking. The discussion of corporal punishment shows that the court did not ignore the father's allegations that the mother and others had hit J.F. The court's weighing of the evidence is readily apparent. The court clearly weighed the father's accusations against the mother's denials and did not find that the evidence established domestic abuse. Appellate courts do not reweigh evidence, pass on witness credibility, or redetermine questions of fact. *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 705. And, thus, the court made no error of fact on this point.

26

4.      *The court found that neither parent respects nor appreciates the bond the child has with the other parent.*

The trial court found that neither parent respects nor appreciates the bond the child has with the other parent. The father disagrees in part. The father argues only that a finding that he does not respect or appreciate the bond that J.F. has with her mother is not supported by the evidence. Rather, the father contends "that it is [the mother] who does not respect or appreciate J.F.'s bond with [Father]. The father further explains the following:  "The record in this case shows dozens of examples of instances where [the mother] refused [the father] parenting time with J.F., talked negatively about [the father] around J.F., interfered with J.F.'s phone calls with [the father], and did other things to negatively impact their relationship." This part of the father's argument is irrelevant.

The court already found that the mother did not respect and appreciate that relationship. Substantial competent evidence supports this finding. Also, this finding is uncontested.

Substantial competent evidence also supports the lack of respect in the opposite direction. In its written ruling, the trial court stated that the father "complains that Mother does not communicate with him about minor details of [J.F.'s] everyday life." The court also noted the following:  "Father believes he is a better parent, with a better home life." From the bench, the trial court explained the following to the father:  "I just feel like you can't leave her alone. You just nitpick everything she does." Giving an example, the court stated that it was "just beyond reason" for the father to demand that the mother set up FaceTime calls with J.F. every day. The court noted the attention span of a seven-year-old, explaining that the mother may not be able to convince J.F. to stay on the phone with her father. The court also mentioned the father's accusative tone when he blamed J.F.'s dental problems on the mother letting her have sugary drinks. The court described this

27

assignment of fault as "an attack on her parenting ability." The court cited examples of testimony from each parent that they met with difficulties from the other parent. The record demonstrates that both parents have a history of noncooperation. So the trial court's finding is supported by substantial competent evidence.

*Did the Trial Court Abuse Its Discretion in Ordering That Residential Custody of J.F. Remain with the Mother?*

On appeal, the father argues that the trial court's decision that the mother would keep residential custody of J.F. was based on errors of fact and law, went against the express recommendation of the GAL and testimony of J.F.'s therapist, was arbitrary and unreasonable, and was not in J.F.'s best interests.

In its written ruling, the court heavily referenced the testimony of the parents but not the testimony of J.F.'s therapist, without explanation. The court did not find Rowley's testimony unbelievable and did not find that it was sufficiently rebutted by evidence to the contrary. In fact, no evidence contradicted Rowley's diagnoses of J.F., nor Rowley's assessment of J.F.'s discomfort about moving away from Joe secretly. The court simply did not acknowledge the repeated testimony from Rowley that J.F. was expected to keep secrets in the mother's home and Rowley's testimony on the negative impact this would have on a child.

The trial court described its reasoning on residential custody, stating the following:

> "The factor that weighs most heavily in favor of maintaining the status quo with residency in Kansas has to do with the inability of Mother, due solely to financial constraints, to maintain the same quality of a relationship with [J.F.], since she must travel to Pennsylvania to maintain that relationship."

28

As discussed in the preceding paragraphs, this finding was an error of fact because it was not supported by substantial competent evidence. Further, the court did not explain what caused it to disregard Butler's premise for recommending a change in residential custody. Butler stated that the primary concern with J.F. residing with the mother is that her home life lacks stability. The court specifically reiterated this point, telling the mother, "I do think your living situation has been unstable." In short, the trial court's ruling on residential custody seems rather inconsistent with the evidentiary substance of the court's findings. In this regard, a trial court's ruling may not be supported by substantial competent evidence if it is inconsistent with the court's previous comments or rationales. See *In re Marriage of Lehner*, No. 96,698, 2007 WL 1667115, at *10-11 (Kan. App. 2007) (unpublished opinion).

Here, the court's written findings of fact and conclusions of law did not acknowledge the recommendation of the GAL. In fact, if the only document included in the appellate record was the trial court's written order, then this court would not even know that a GAL had been appointed in this case. Yet the GAL is a critical tool in child custody determinations. "[T]he need for an independent guardian ad litem is particularly compelling in custody disputes. Often, parents are pitted against one another in an intensely personal and militant clash." Elrod, *Reforming the System to Protect Children in High Conflict Custody Cases*, 28 Wm. Mitchell L. Rev. 495, 526 (2001) (quoting *Short ex rel Oosterhous v. Short*, 730 F. Supp. 1037, 1039 [D. Colo. 1990]). Thus, given the importance of the GAL, a court runs the risk of committing an error of fact by disregarding the GAL's recommendations.

In sum, the trial court stated that J.F.'s living situation with her mother was unstable, yet the trial court kept residential custody with her mother. A trial court's ruling may not be supported by substantial competent evidence if it is inconsistent with the court's previous comments or rationales. *In re Marriage of Ziebart*, No. 117,293, 2018 WL 1545786, at *13 (Kan. App. 2018) (unpublished opinion). The trial court also found

29

that the mother's financial constraints prevented her from exercising long-distance parenting time. Both determinations were errors in fact that constitute an abuse of discretion.

For the preceding reasons, we reverse the decision of the trial court and order that primary residential custody of J.F. be awarded to her father, and we remand with directions to the trial court to make all other orders that are not inconsistent with this opinion.

Reversed and remanded with directions.